Again, Pace versus Ford Motor Company. So we're back to the 097 patent, and here we have a different claims mix that is at issue. And I'd like to begin by first pointing out that in the context of this particular appeal, we talked earlier about there being a spectrum of claims that talk about the controller clauses. In Claim 1, the controller is recited, but it's not recited in terms of the wherein clauses. It's a method step and it's set forth actively. Claim 16 builds on Claim 1 and makes eminently clear there can simply be no question about the linkage that my brother talked about with respect to Claim 30, whether the first controller clause and the second controller clause are linked together, whether limiting the rate of change of the output torque of the engine is somehow linked to supplanting that missing torque using the electric motor. Claim 16 resolves any dispute about that, and it does that in the third substantive clause there. And it says a highway cruising mode for when the SP or the set point is less than the road load. Claim 16? Claim 16, yes. Of the 097? 097. I think I'm looking at the correct thing. I'm not seeing anything about highway cruising mode. I'm sorry, Your Honor. I've got the wrong one in front of me. It's Claim 21. Okay. The point I wanted to make about Claim 16 is that it actually requires you to start the engine. That was a missing piece from the last appeal, that a comparison to road load has to be used to start the engine. That's nowhere been shown in the prior art. But looking at Claim 21, Claim 21 specifically links the first and second wear-in clauses or controller clauses, if we want to call them that. And it says that if we look at the actual structure of the claim, the first controller clause says employing the controller to control the engine such that a rate of increase of output torque is limited. We've seen this before in other claims. And then it says supplying additional torque from at least one electric motor and wear-in said step of controlling the engine such that the rate of change of output torque of the engine is limited is performed such that the combustion of fuel and within the engine occurs at substantially stoichiometric ratio. So the idea here is that it specifically links the notion of limiting the rate of change with supplying the additional torque from the electric motor. And that's an important aspect. So as we've talked about the claim construction, the contextual claim construction argument that we have, the linkage between the controllers is made manifest in Claim 21. There simply can be no question that those two have to work hand in hand. We also have the same arguments we had with respect to Anderson in the prior repeal that apply here. And I won't repeat those. But again, very importantly, Claim 21 adds this additional aspect that what they not only have to show is that somehow the prior art limits the rate of change, but that it also supplies the electric motor torque while it's limiting the rate of change of the engine. So the way the structure works is that as the engine, the driver says, I want to go faster, the microprocessor says, no, you will not. I'm going to limit the rate of change of output torque and at the same time supplements it using torque from the electric motor. We've talked about the fact that Anderson doesn't talk about limiting the rate of change. Here we've made manifest that it must also, that the prior art must also show that the electric motor is used to supplement the missing torque. And that is nowhere shown in the prior art. I spoke a little bit about the Severinsky reference and their reliance on the Severinsky reference with this combination. That is facially defective for one very important reason. The Severinsky 970 patent doesn't bring the electric motor on at all until the engine has reached maximum capacity. So let me just make sure I take that apart. So what happens in the Severinsky 970 case is that the electric motor moves the vehicle. When it reaches a certain speed, the engine comes on. The engine alone then drives the car until the engine is maxed out. When the engine is maxed out, then the electric motor is brought back in to allow further acceleration of the vehicle. It does not show in any way, shape, or form any ability to limit the rate of change of the engine. But even if it did, it tells us you don't bring the electric motor on until the engine is already at 100%. So the notion that you're going to somehow supplement the missing torque from the engine using the electric motor is nowhere. It is nowhere in this record. And Ford can't point to it. What they've said is, well, you know, if the driver decides not to push so hard on the accelerator, then the engine will not accelerate as quickly as it might otherwise. That gets us back into the limiting discussion that we had before. That the limitation is not just any possible radiation in the torque. It has to be limited with respect to something. And the something here is the driver's demand. And so Ford can't show that Severinsky or Anderson limits the rate of change of torque. But very critically, when they rely on Severinsky and they say Severinsky shows that you're bringing on the electric motor to supplement torque, that cannot happen in Severinsky 970 until the engine reaches 100% of its output. And so it is impossible. It is impossible for that combination to somehow accomplish the methods of the 097 patent. Impossible. Any questions about that? Can I just ask you to see if you can explain column 14 in particular? This goes back to the point I was talking about with Mr. Moore. I'm just trying to understand. There are that column in particular that distinguishes a number of pieces of prior art, Frank, Igami, others, in ways that I do not understand well enough, but seems to suggest that pedal position is not road load, even the little too small MV asterisk, the vehicle driving torque demand of Igami is not road load. Can you enlighten me? Certainly. When you're designing one of these vehicles, you have to make a decision about what to use as the input to your control algorithm. Lots of people have used different approaches. Many have used pedal position because it is a very simple approach that the further you depress the pedal, you cycle through the hybrid componentry that you have available to you. And Frank shows some of that. They also talk about speed, that the idea that you can, as the car begins to accelerate, it is generally true that you will operate the engine more efficiently at high speeds than at low speeds. And so Dr. Severinsky's 970 patent embraced that. And Igami talks about this map concept that you were referring to too, but it seems to distinguish it from road load. It does. You were explaining you use a map to calculate road load. That's part of why I'm confused. Well, that's right. So what happens in Igami is they toy with the idea of using different inputs to drive decisions between hybrid componentry. But what they didn't do was to somehow create the map, the real world map, that was necessary in order to translate some of those inputs into true road load. And so we've discussed, it's not an issue in these appeals, but we've discussed Igami at some length in some of the parallel litigation because it has to do with, you know, they've made validity challenges based on Igami in the past. And we've distinguished it because Igami's maps, which again are the way that engineers actually employ road load in real systems, Igami's maps don't show that road load. They don't show that real world testing necessary to make that happen. My colleague also reminds me that the Igami system is actually a series parallel, so it has different considerations as well. But the calculation of road load is very important and it is something that is at issue in this case in that what they need to show is that the prior art determines road load and then makes that comparison to make mode changes. For example, to start the engine as in claim 16 of the 634 patent. And that is simply nowhere in this record. You'll see a fair amount of discussion of pedal position as well in column 14. And again, pedal position is a possible metric, but it is not sufficient to show road load. I want to be absolutely clear about that. Again, there's nothing in the patent here that tells you how to determine road load. That is true. That is true. But the board, we had a long discussion before the board about whether or not they should clarify that by looking at the extrinsic evidence and providing a definition of how to determine road load. And the board declined to do that. We actually gave them, both sides I believe, possible suggestions and the board decided they didn't need to do that. So with respect to this particular appeal, what makes these claims unique, claim 21, is that you have both the road load limitations and the comparison to set point as well as the limitations regarding limiting the rate of change of output torque and supplementing it with the electric motor. So we see that where the set point limitations, for example, in claim 21 are set forth and we have to operate the electric motor when road load is less than a set point. Again, the first comparison that has to be made and operate the internal combustion engine when it's above a set point, a second comparison that has to be made. In nowhere in the prior art has Ford been able to point to a comparison of any kind. So we had a discussion earlier about column 20 and the notion that there is this aspirational 60 to 90 percent range that is set forth for the efficient operation of the engine that doesn't tell us how to get there. But more importantly, it never accomplishes the comparisons that the claim textually requires. Why aren't road load and torque output the same thing? Because it seems to me that what you have is a situation in which the operator decides to depress the pedal enough to get the vehicle moving and what the system is doing is measuring the amount of pedal pressure and the torque produced by it. Imagine, your honor, that you're driving at 30 miles an hour and you depress the pedal enough to 45 degrees. The behavior of the vehicle is going to be decidedly different because there is already loading on the engine. Propel the vehicle has to mean propel the vehicle at the speed that the operator wishes to go, right? Well, it's speed, it's delta speed, and it's the derivative of delta speed. So it's the first and second derivatives of speed as well. And then we have to look at the fact that the pedal position itself isn't static. So you have pedal position, then you have the first derivative of pedal position. So the operator decides how much torque do I need? The vehicle is going too slow. I'm going to depress the pedal some more. And the amount of the depression of the pedal is both the torque output and what's necessary to propel the vehicle, right? Not entirely. So you have to... Why is that? Why is my statement wrong? Because you have to take into account the other forces that are on the vehicle. And I think that's why we haven't seen any of the prior work. What do you mean the other forces? I mean, the operator depresses the pedal, the vehicle moves. It's the amount of torque. He has the engine to produce the amount of torque to propel the vehicle at the speed that he wants to go. We haven't seen any of the prior art that Ford points to or the board relied on as relying on pedal position for that reason. It does not represent the actual road load of the vehicle. This real-world mapping situation or process that engineers go through is profound. It's not trivial. There are lots of different operating conditions. We've even seen that they change based on the region. What are you suggesting? That there's some measurement of torque required to propel the vehicle that's made before the vehicle is asked to propel at that speed? I'm saying that when commands are issued by the driver, and there's no question the driver is the prime mover here, that those commands... So there's no determination of road load except by the driver who determines how much to depress the pedal. Well, again, Your Honor, there's a microprocessor that runs them through these maps that allows it to determine road load. It's what we've seen. And that's the way it actually works. I'd point out quickly that when you're just starting out, you're in electric mode only. And so the decision there is somewhat trivial. The idea is that the road load is going to be less than a set point, and therefore the electric mode would be driving the vehicle. But you asked a moment ago why the output of the engine couldn't be the road load. And we have figure seven. Figure seven shows us, it demonstrably shows us, that road load and the output of the engine are two different things. And it's not trivial. Sure, they're different things. But what the operator is determining is, I want to get the vehicle moving, so I'm going to adjust the torque that the engine is producing to measure the amount of torque that's required for the road load. Right? Yes, that is a big input. A big input, but it is not dispositive. A 30% declination of the pedal when I'm going uphill at 30 miles an hour, it gives me a completely different result than if I'm going downhill at 60 miles an hour. They're simply, the other factors that are acting on the car must be part of the road load equation. Can I ask one question? You have infringement litigation that at least was initiated? We have. Have you identified a component of the accused vehicles that provides the road load input? We have. We have had successful litigation against Toyota. Is that something that you can, I don't know whether all this is confidential, that you can describe how it works? Well, I think I've described it kind of in the confidential terms I'm at liberty to use, that they do this mapping process. But we have seen, and again, they're highly confidential technical disclosures of the use of a torque value that is calculated and then used as the control input. Which is not described in the patent? The calculation of road load is not. That's correct, Ron. Okay. All right. You're out of time. We'll give you two minutes for rebuttal. For convenience, I'm just going to pick up where we left off on road load. In this simple calculation here, we've heard there's no discussion of how road load is calculated in the PACE patents. But if we compare figure four of the 097 patent to figure three of the prior art 970 patent, you'll see they're exactly the same. What you see is the inputs to the microcontroller. It has two sets. Operator commands, which has acceleration, accelerator pedal, direction, steering wheel, deceleration, brake, and cruise control. All operator commands that we all use with our vehicles every day. That's the inputs to the microcontroller. It also has some data inputs, where it talks about engine speed, motor speed, battery voltage. The figures are identical. The figures show the same operator command inputs, the same data inputs. So there can be no question that the 970 patent teaches the same inputs to road load as the figure four in the 970 patent. We also know that this road load construction wasn't disputed before the board. And there's been no dispute that road load is simply the torque required to propel a vehicle. We just heard that it requires consideration of other factors. Road load's been agreed on a construction by the parties as the torque required to propel the vehicle. Nothing about that construction requires consideration of any special factors. And even if it did, by comparing the figure four in the 097 patent to figure three in the 970 patent, you can see they're exactly the same. We've heard a lot about this in the last appeal that there's nothing in the PACE patents that talks about wind sensors for monitoring the wind resistance, or terrain sensors for monitoring whether you're on sand or pavement, or incline sensors to determine where you're going up a hill. There's no disclosure of that. In the PACE patents. Now, moving to Claim 21, which is where this started, and this is actually in the 1411 appeal. In the 1411 appeal, Claim 21 does not require the motor supplement limitation to occur at the same time as the rate limit limitation. We heard there can be no question. There is a question. For the same reasons we disputed regarding Claims 1 and 11, we also disputed here. They're separate limitations separated by a comma. There's an and between the two. There's nothing in the claim language that requires them to occur at the same time. And there's also, it's irrelevant because Anderson discloses it. Anderson discloses a hybrid strategy that only allows slow transients, and how it only allows slow transients is by placing the burden on the battery which drives the motor. So that's got limiting the rate of change of engine output torque by only allowing slow transients, and it's got the motor supplement limitation by placing the burden on the battery. We also have ample expert testimony, excuse me, to support that to show the substantial evidence. Ford's expert, for example, was credited by the board on page A16 through 17 of the 2033 appeal and on page A9 and 10 of the 1411 appeal. And the expert testimony on this is particularly regarding the battery, placing the strain, that strain being used, talking about a motor, excuse me, particularly language placing greater strain on the battery, meaning that you use the battery to power the motor and supplement the engine. That's in the 1411 appeal at A3846, and the sites of the deposition are 236, lines 10 through 25, and in the expert declarations at A4035 through 39. So all these issues have been raised before the board, properly rejected by the board, and there's substantial evidence to support the board's decision. With regard to motivation to combine, limit, not driver's demand, that the limit here is not the driver's demand. When you look at Anderson, Anderson talks about slow transients. The driver doesn't have anything to do with limiting slow transients. That's the hybrid strategy. If you look at the Anderson reference, there was a lot of talk about components versus hybrid strategies. What did you say about the driver and slow transients just now? There was an argument by my brother that said Anderson is talking about it's the limit is by the driver's demand. That the limit on the rate and change of engine output torque was by the driver limiting the engine pedal. And that's how it wasn't sufficient to satisfy the rate limit limitation. So we've got the rate limit limitation. You've got to limit the rate and change of engine output torque. And that Anderson didn't satisfy, this was an argument by Pace, because it disclosed the driver limited the amount of fuel going to the engine and the slower transients, not the control strategy. And I'm saying that's incorrect because Anderson shows when you're limiting the transients, you're limiting how fast fuel goes to the engine. That's literally between your throttle and your cylinders and your engine that determine how fast that fuel can go into the cylinder so you can have a stoichiometric combustion within that cylinder. The driver doesn't have anything to do it. The driver can press the gas pedal hard, but how Anderson limits the slow transients is it instead of putting all that burden on the engine requiring a large influx of fuel, it only allows a slower influx of fuel, so slower transients, and it places the burden on the battery in the motor. And we know that because all this talk about components versus strategies, the title of the Anderson reference is the effects of the APU, that's the engine characteristics, on the design of the hybrid control strategies. Anderson is all about hybrid control strategies. And when you put Anderson together with Severinsky, it's a classic KSR combination. You're taking the known technique of slowing transients and doing it with the motor with Severinsky. The Severinsky base system, they're both hybrids, they both want to improve fuel economy, they both want to reduce emissions, they both want to reduce the same types of emissions, hydrocarbons and carbon monoxide, and they both do it the same way by using the motor to supplement the engine. Severinsky does it by only operating the engine in its sweet spot, that 60% to 90% of maximum torque output, and it uses the motor to drive the vehicle below it, and it uses the engine and motor above it. Anderson reference comes in and says, okay, we have the same goals as you, but in this mode where you operate the engine, you can further improve it and further reduce emissions by preventing fast transients, by preventing in those times when a driver wants rapid acceleration, instead of putting all that burden on the engine and having poor emissions, you can then put some of that burden on the motor, like you've done below the sweet spot and above the sweet spot, put some of that burden on the motor while you're operating your engine too, and you can further reduce those emissions. So the systems fit together hand in glove, and there's ample expert testimony on this about this combination. There's over 30 pages of it, and if you're in the 1411 appeal, it's at page A339 through 340, A4046 through 77, and A188 through 200. So there is more than substantial evidence to support the board's opinions on all of these points. Unless there's any further questions. Okay, thank you, Mr. Brown. Mr. Cordell, you have two minutes. Okay. So if I can begin back with Claim 21. My brother said that there wasn't any linkage between supplying torque from the electric motor when the engine is being limited, and that's just not there. So that's just not the case. So in the clause that we've numbered little to I, employing said controller to control the engine such that a rate of increase at output torque of the engine is limited to less than said inherent maximum rate of increase of output torque, and if the engine is incapable of supplying instantaneous torque required to propel the hybrid vehicle supplying additional torque from at least one electric motor. It is chromatically linked together. It is structurally linked together. It is technically linked together. It says in a single phrase that you limit, you artificially limit the rate of change of the output torque of the engine and then supply the missing torque from the electric motor. That is a key aspect of all of these inventions, but it is, or all of these claims, but it is made manifest in Claim 21, so I don't want to lose sight of that. My brother also said that, he said that we characterized the Anderson reference somehow as the driver being involved. I don't think that's quite right. Ford said that that was Severinsky. Ford looked at the Severinsky and the board looked at the Severinsky reference and said, well, sometimes the driver doesn't push so hard on the pedal, and so that's limiting the rate of change. But again, for the reasons that we talked about earlier, with respect to the term limiting has to be with respect to something that simply can't be. There is no evidence that Ms. Anderson discloses any kind of limitation between the throttle and the cylinder or the pedal and the cylinder. She simply says, use slow transients, that's a good way to go. And she tells us at page seven of nine of her paper that immediately the way to do that is to use a series hybrid. It's the penultimate paragraph on page seven of nine, and we've been through that. We should also point out that Ms. Anderson says you cannot use a parallel system. She is specifically denigrating the Severinsky 970 approach and does not say that you can do it. In fact, she says don't do it. She says they always use as fast transients with respect to a parallel or follower system and therefore don't do it. Mr. Criddle, I think we're out of time here. I thank both counsel. The case is submitted and that.